Good morning, may it please the court. My client, the appellant, loaned $500,000 to Appalee so that he could form a company. Appalee, a cardiologist, wanted to form a cardiology business. He had never formed a business before. He went to my client to borrow money for that purpose. My client required his financial statement because that is what they wanted to base the business judgment to loan the money. He had no prior business or social connection with my client. The business failed. It was a term note of one year. The business filed bankruptcy. Appalee filed bankruptcy. My client objected to Appalee's discharge under Section 523. We've read the briefs and we know about the underlying facts, so why don't you move on to your legal point. You can refer back to the facts if you want. Oh, that's fine. Thank you, Your Honor. There are two financial statements at issue here. I'm going to focus on the second financial statement, although we do believe that there were grounds to deny discharge based on the first. The key here— My main question for you is how do you overcome the clearly erroneous standard on the finding regarding reasonable reliance? Right. Your Honor, the issue with respect to reasonable reliance, as we've noted by the Court or the cost in case, this Court identified certain factors which the Bankruptcy Court is going to be looking at with respect to whether the reliance was reasonable. Were there prior business dealings? Were there any red flags that would alert a reasonably prudent lender to the possibility that the representations were not accurate? Whether minimal investigation would have revealed the inaccuracies of the representations? Here's the problem. The Bankruptcy Court required my client to essentially go through its underwriting and committee notes and other things to justify whether or not the personal financial statement of the debtor was valid, truthful, and honest. This is the debtor's financial statement. The main thing you objected to about the statement, as I understand it, is he didn't disclose that he had guaranteed the Phillips note. Yes. Was it a lease or a note? It's a lease, huh? Right. But what I want to ask you is, I mean, the Bank was aware that he was going to buy this expensive equipment. So, you know, when you loaned him half a million dollars, you made him sign the back of the        I would. I would. I would. I would. I would. I would. I would. I would. I would. I would. Okay. So you would naturally think that anybody loaned him more than that would require him to personally guarantee it? Yes, Your Honor, the question was raised at trial. Mr. Wood testified, and we cite his testimony in a footnote I believe on page 12 of our brief. He stated that it was his experience that not all lessors required a guarantee with respect to leases. Okay. That issue. Oh, I'm sorry. But I also saw the memorandum that he wrote, his internal memorandum, which I assume he was the loan officer, and he wrote that memo to a loan committee or the board or somebody to approve the extension of the loan. So surely somebody on there would have had some experience to think of that. The evidence doesn't show that. The evidence only shows that Mr. Wood testified. He was the only one, only financial expert at trial to testify with respect to banking. I mean, we do have this evidence that he wrote the memo to the board or to the loan committee or who is it to? To the loan committee. That's correct. And all of what Your Honor is focusing on goes to the first financial statement. And that particular statement, the issue there was whether or not the statement predated or postdated the guarantee of the lease. Okay. But he didn't disclose that either when he filed the second statement. More importantly, what he didn't disclose was the fact that he had been sued by the lessor, he and his wife, had been sued by the lessor, they had given a consent judgment and a new guarantee with respect to the lease. They defaulted on the business, defaulted on the second lease agreement, and his guarantee was called and they went ahead and got an entry of the consent judgment in, I believe, the Pennsylvania court. None of this was disclosed in connection with the second financial statement. And Mr. Wood testified at trial that this would have been a very important factor with respect to whether or not he would have relied on the financial statement to support other  What we're talking about here is reasonable reliance. The bar for reasonable reliance has been set and has been noted by the court as a very low hurdle to meet. There is no evidence that the appellant acted here in bad faith. When the bankruptcy judge raised issues with respect to red flags, here's what he focused on. One was, why did the bank accept a financial statement that was not on its form? He was troubled by that. The bank rep, Mr. Wood testified, and it's in the record at page 719, that this was not unusual. Debtors put on no evidence to the contrary. The second red flag that bothered Judge Nelms was that the second financial statement contained no signature, and it was also not on a form that the bank required. Well, the second financial statement contained no signature. That is true. All right. And it is on a different form, and it's a different format, but it's a financial statement. If you read section 523a to b, one, it says use of a statement in writing, and that's all it says. A statement in writing of the debtor's financial condition, and that is what was presented by the debtor through his wife to the bank, and that was what was relied upon by Mr. Wood in terms of formulating his recommendation to the committee. You don't have to have a writing that is signed, and you don't have to have a writing that is on a bank form. Mr. Wood testified. He accepted it, and he recognized it as a financial statement, and he relied upon it, and his reliance was reasonable. The third red flag, the third red flag was that appellant did not require the debtor to present updated state-of-the-heart cardiology, that's the business's financial information for the request for extension. Remember here, what is being relied upon by the bank is the debtor's financial statement. 523a to b does not require anything further than reliance upon a financial statement in writing of the debtor. And so for the court to essentially add an element to the analysis of reasonable reliance based upon an independent, exhaustive demonstration with respect to the underlying finances of the business was a step beyond what the courts have required with respect to what is reasonable reliance. If I might draw the court's attention to the Colston decision out of this court, we cited this in the brief, it's probably the primary principle case in this area from this court at least, not on point per se, but it's which the court speaks to the issue of reasonable reliance. And the court in that case relied on the case of Lansford, which I believe was out of the Seventh Circuit, Sixth or Seventh Circuit, I apologize. This court adopted the position, and I quote, we cannot credit a debtor's argument that reliance on the financial statement was unreasonable because the lender failed to verify the information in the financial statement, particularly when the debtor's financial statement is clearly false on its face. I pause there, all right? Judge Nelms found the statement to be false and was presented with the intent to deceive my client, right? The court goes on. The debtor knew that it was false, yes. The debtor knew that it was false when made because the debtor knew, prior to the time of submitting that written financial statement, that he had had a $2.3, now probably $3 million, fixed judgment against him, and he didn't disclose it. It wasn't something that my client could have readily obtained through reasonable inquiry within its own records. It was something peculiarly within the knowledge of the debtor. The bank did get a financial report, didn't it, a credit score? I'm sorry, he gave a financial statement? No, no, the credit score. Didn't the bank get a credit score, though? I won't deny that that's not in the record, but the bank never knew that there had been a judgment placed against this, and this is a state court judgment, and I'm not sure what, if there's a credit report in the record, I apologize. I'm not sure if that would have shown up and how soon in time it would have been reported or anything, so I apologize on that. As the court goes on, the debtor knew or should have known that the creditor would rely on his or her financial statement. That's why he's giving the financial statement. The bank asked for an updated financial statement. We're a year later now from the original financing, and the bank said, I want to see what your financial picture is. We're relying upon that. You're a primary guarantor of this obligation, and the creditor could not know or did not know that the creditor would look outside the statement. In other words, there was no obligation until Judge Nelms, and I've got to tell you, Judge Nelms's decision was rendered from the bench. It's not a published decision per se, but that's the first time I've ever seen or read a decision which said, I know you have a financial statement, and I know it's supposed to be upheld, and you're able to rely upon it, but I'm going to say that you've got to go beyond that. You've got to go way beyond that. You've got to investigate your own records and do a behind-the-scenes review of the veracity of that statement. Well, let me tell you, that's way above the bar that has been set by the courts, as we discussed in our brief, and to require that, it would be—our position would set a standard that is certainly not what was intended by the framers—I mean, by Congress in enacting the Section 523a to b of the Bankruptcy Code. So one of our concerns, particularly as to the second financial statement, is the Bankruptcy Court clearly found that it was a statement in writing, that it was a statement with respect to the financial condition of the debtor. It was published to the bank and found that it was published with the intent to deceive because what? It was materially false, because we demonstrated in the trial by evidence that he knew at the time he submitted that financial statement, he and his wife both knew that they were joint debtors in a judgment of $2.3 million against them. They did not disclose that. What the Bankruptcy Court did said, he added a new factor, okay, to the test of reasonable reliance that this Court has set out and adopted in Colston, added an independent verification on the part of the creditor. No case I've seen has ever done that. Congress never intended this to be the case. This puts, I would suspect, or I would submit, an improper and unjust burden on the creditor. The creditor, and I believe I cited in our brief, but the creditor should be allowed to rely upon the financial statement as provided. The creditor does not have to go beyond that and check it out or subject it to cross-examination. This Court has held on many times that only the honest debtor is entitled to a discharge. The Bankruptcy Court clearly found this debtor to be dishonest. He presented a financial statement in writing with the intent to deceive my client. He submitted that statement on September 27, 2013, right? I believe that's correct. The judgment was entered October 16, but he had an obligation to update. Is that what you're saying? Yes. Well, first of all, he had an obligation to update the first financial statement. That's clearly in that. But this particular, the second financial statement didn't disclose the fact that he had, in fact, done all of that, but that he had defaulted and that a judgment was or would soon be entered against him. Well, but when the statement was submitted on September 27, the judgment hadn't been entered yet. Yes, but he knew that it was a consent judgment. He knew that he had agreed to the consent judgment. He knew that he had defaulted or that state-of-the-art cardiology had defaulted. It was a fait accompli. It was going to happen, and he didn't disclose it. And it was going to be a material, have a material impact on his financial condition. He didn't update his first statement. That's for sure. Okay? But as to his second statement, it was something, it was certainly a contingent liability, which he should have disclosed. I'll reserve five minutes. Yes, you saved time for about a, thank you, Mr. Director. Docs? Okay. Good morning. This is a case where the bank had the information, the creditor had the information about the financial situation of the debtor's business and had sufficient information in its records that should have alerted it to the fact that the financial statement submitted by the debtor, the second one, was inaccurate. For example, the 927 financial statement was submitted, and an assistant or a secretary at the bank pointed out to Mr. Wood, the bank officer, that it had no contingent liabilities on it, including the debt owed to the guarantee on that particular loan. It was pointed out by a secretary to the bank's officer, and he agreed to accept it anyways. So that right there is a sufficient red flag that should have warned the bank to do further investigation. And that's what the bankruptcy court found. The bank knew about that, so how's that material if they knew about that loan? Well, it's an obvious inconsistency on the face of the document. Yes, you know about it, but if you're looking for a complete, it should make you wonder what else is missing. And then as the bankruptcy court went on, there were other things that should have made them ask for more information. There is, for example, an email in the record between the bank's representative and the debtor's wife about needing to see updated financial information from the debtor in hopes that the personal liquidity situation will improve. That's in December, after the September loan has been extended and before the April renewal. In December, the bank was aware that they needed to see improvement in the financial situation of the debtor, but come April, they did not ask for any updated financial information. Well, I mean, they asked for it, and I assume they thought if they didn't get anything, it didn't need updating. Well, there is no evidence in the record that they asked for it. Pardon? There's no evidence in the record that they asked for it. I thought you said the bank wrote the email. In December, he said they would need to see that, but they never followed up. There was never a request. Okay, let me ask you this. I mean, the bankruptcy judge found that he made a knowing false statement. Do you agree with that? And so the statement was submitted on September 27, but way back in July, he had deported on the equipment loan, and then in August, he settled that with the — or they entered into a lease for $2 million, and it had a lot of payment schedule. So all that happened before the statement was submitted. So what would have alerted the bank to that? Well, there's no question that the lease and the subsequent guarantee of the lease were omitted from the financial statement. However, as the record shows back at the timing of the first loan, the bank was aware that there was a plan to finance a CT scanner and could have reasonably assumed, and this is why Judge Nelms felt that the first statement wasn't false, the bank could have reasonably assumed that as it required a personal guarantee from Mr. Osborne, that an equipment scanner would likewise require a guarantee. Well, I assume that, but how would they know that he had defaulted on that loan? The court's correct. They wouldn't. There's no way they could have known that. That's correct. The debtor failed to disclose that information. And then, let's see, so then in October of 2013, a week after they filed a statement, he entered a complaint. He, Osborne, confessed judgment, and the Pennsylvania court entered judgment. He didn't report that. And then on December 23rd, the loan officer met with Osborne to give him a status request on the loan, progress of the loan, and they didn't disclose any of that. And then there was this two and a half more months before they actually make the loan. And during all that time, there's no communication from Osborne to the bank. That's correct. But the issue here isn't that that disclosure didn't happen. That's accurate. But there's no evidence in the record. In fact, there's testimony that that would have been an item for consideration. There's no evidence and no statements in the record from either bank officer that they would have refused to make the loan had they known about the default judgment. There's a statement from the officer saying he would have recommended to the committee that they pursue collection, and it would have been a possibility that the loan wouldn't have been extended. But a possibility that the loan wouldn't have been extended is not the same thing as we absolutely would not have extended the loan. There were other items for consideration. After all, when they're looking at the financials of this cardiology practice in the spring of 2014, they acknowledge that the cardiology practice isn't making any money, and it's being funded by the debtors, personal loans to the business, and that they're not going to be able to rely on the guarantor or the debtor to support this debt. But they're assuming that he'll get some speaking fees. So they're aware that they've assumed the risk here of this loan because they're aware that he can't support it, and they don't seem to care. Well, I mean, they're saying they reasonably relied on that statement to make the loan. The bankruptcy court found that they didn't reasonably rely. They had enough information that should have told them, and not even a thorough or overwhelming, exhausting investigation like the appellant is suggesting. The bankruptcy court said a minimal investigation because on its face there were enough inconsistencies. You know, I've got in the record from someplace that the bank did get a credit score on October 24th, and it showed a credit score of 712. Yes. Well, they did do something. They got a credit score. Okay, they got a credit score, but they still extended a loan in the light of significant information suggesting that they shouldn't. They still apparently decided to rely on a 7-month-old financial statement by April, even though they knew on the face of the documents submitted about the cardiology practice that there was a problem. That was what the bankruptcy court felt was that there was evidence in the record that supported the idea that the bank should have just literally just looked at its own documents. Yes, but, I mean, they're looking at whether Audubon can pay it the guarantee. I mean, to me, it's one thing to look at the guarantor and say, look at his statement and say, well, yeah, based on this, I can bank on him paying it off if the business fails. There's something else to say that the business wasn't doing well. I mean, the bank knew that, but they, you know, maybe they shouldn't have made the loan, but that doesn't have anything to do, in my mind, about them relying on his personal statement. Their own loan document, their own loan committee presentation, says that the guarantor's personal financial statement shows an inability to support the debt. That's right. They probably shouldn't have made the loan. But that doesn't mean they can't rely on the doctor to guarantee the loan. How do you reasonably rely on a statement that you know is inadequate? Say what? They can't reasonably rely on a statement that is facially inadequate. That was the bankruptcy court's position. Certainly the business couldn't pay it off. They were relying on the doctor. Correct, and the business financial showed that the debtor was funding the business's existence. There were huge shareholder loans, something on the order of $700 million in shareholder loans. Those were the red flags that the bankruptcy court considered to warrant literally just a minimal amount of cross-reference. There's an inconsistency in the profit and losses of the statement that would have reflected there was something amiss. There's the lack of contingent liabilities on the financial statement. Back in September, the state-of-the-heart financials aren't updated. There's significant red flags here, and within their own conversations, the bank's own conversations, they acknowledge a lack of ability to support the debt based on that financial statement. So if you're relying on a statement that you know is inadequate and you know reflects an inability to support the debt, how is that a reasonable reliance? They knew there was a problem with the business being able to service the debt, but I'm just asking you, why is that a different issue than whether they can rely on Osborne to guarantee the debt? Well, they knew they couldn't rely on Osborne to guarantee the debt. That's their statement. Say what? Their literal loan presentation says that you cannot expect the guarantor to support this debt. Well, I saw that there wasn't any basis for the business to support the debt. There's also a line in there about the guarantor not being able to support the debt. Where is that? Give me one second to point it out to you. Is this in the report? It's in the committee report, yes. On page 536 of the record. What? 536 of the record, and then over to 537. So on 536, the borrower, the business, reflects negative cash flow and is unable to support the debt to the bank. On the next page, the personal financial statement does not reflect the ability to support IVT's debt. And then it clearly states that there's no contingent liabilities including the guarantee of this particular note. So the bank is aware that there is a problem. The bank is acknowledging that the guarantor lacks the ability to support the debt, that the guarantor is essentially supporting this business. Bankruptcy courts and the Congress did not intend for creditors to essentially make risky loans and expect the bankruptcy courts and these courts to bail them out when they put their heads in the sand and ignore obvious inconsistencies and obvious red flags. This is not a situation where the bank needed to go out and do a thorough independent investigation and verification. It is a question of literally comparing documents and asking a few questions. The bankruptcy court, for example, pointed out that the difference in the profit and losses should have triggered a couple of questions to the borrower or to the Osbournes. Why is this profit and loss done on the accrual basis and this profit and loss is done on a cash basis? That's a simple question right there on the face of the documents. That was the bankruptcy court's position and there is evidence in the record to support all of the bankruptcy court's finding. Just because there is some evidence to the contrary does not mean, of course, that all of the evidence and all of the conclusions reached by the bankruptcy court were improper. As long as there is some evidence in the record, this court should uphold that decision. So the bankruptcy code is designed to protect the dishonest debtor? No, not as a general rule, but I think there has to come a time. In every case that you read where there is a situation like this one where the debtor prevails in a 5232b type action, it is because the creditor was aware and had knowledge and had issues that put it on notice, facts that put it on notice, to make it suggest that you should do a little bit of verification. Again, we're not expecting creditors to go out and run extensive background checks and hire private investigators, but if you have the information in your possession, if the inaccuracies and inadequacies of a statement are pointed out to you and you acknowledge that in writing, should you then be able to turn around and say, we reasonably relied on a statement? Of course not. That's not the purpose of it. Everybody is expected to do their own amount of just reasonable, basic due diligence, and the totality of the circumstances is what we're talking about. A lot of cases say that the reasonable reliance requirement is in the code to protect the borrower from a bad faith lender. Is this bank in bad faith? I don't know if it's in bad faith, Your Honor, but I would submit that it didn't even act as a reasonable lender would do. The rule is there to protect a reasonably prudent individual, a reasonably prudent lender, and I don't think that there's any evidence that this was a reasonably prudent case to rely on. By April, we're talking about a 7-month-old financial statement in a business that's clearly failing. Why would you, as a lender, not request updated financials, updated tax returns, things like that from your guarantor? It is clear by April that they are aware that not only does the business not have the ability to support the debt, the guarantor doesn't have the ability to support the debt, and yet they renewed that loan for five years. That sounds like assumption of the risk. It was a risky loan from the beginning, and they chose to make it in spite of the red flags, and that's why the bankruptcy court ruled in favor of the debtor. It's a low-standard reasonable reliance. That's how little this creditor did to protect itself, is that it didn't even meet the low standard of reasonable reliance. It didn't cross-reference its own database, its own documents. There was nothing— Even if we disagree with that, the bank has to show that the bankruptcy judge's decision to the contrary was clearly erroneous. Correct, and I don't think there's enough evidence to support that. In fact, there's plenty of evidence supporting that it was a reasonable finding under the circumstances. Reasonable people could disagree about the bankruptcy court's conclusion, but as long as there is some evidence in the record to support Judge Nelms' conclusions, they should be upheld, and that's what happened here by the district court, and that's what this court should do. All right, thank you, Ms. Connell. Thank you. Zachary for the bottom. Thank you. Very briefly, with respect to your statement, Judge Smith, on clearly erroneous— Yes, there are facts that need to be reviewed based on the clearly erroneous standard. However, we would submit that Judge Nelms essentially applied an improper legal proposition with respect to the scope of what is reasonably recognized as reasonable reliance. He added, you must make an independent investigation into the validity or veracity, essentially, of the financial statement, and that, as a matter of law, was incorrect, and therefore, all of the things that he found, as I pointed out, the red flags were improper. Not only are they not supported by the evidence, but they're not required as a matter of law. As Judge Davis, as you stated, it's our belief that Congress did not intend creditors, such as my client, to independently verify every fact in a financial statement submitted by a debtor, nor did Congress mandate a specific form the debtor must complete with respect to financial statements. We cite on page 14 some discussion with respect to this matter. Specifically, the term reasonably relied, as it appears in section 523A2B, was, as even counsel noted, and you noted, Your Honor, was intended to prevent creditors from requesting false financial statements from debtors for the purpose of using them to object to discharge. Well, that's not what we have here. We have a financial statement, which we want to basically find support to loan money to a debtor. Never in our wildest dreams, and there's no evidence to suggest otherwise, would we believe that this debtor was going to file bankruptcy. The legislative history of section 523 does not indicate any alternative scenario, that any alternative scenario should be protected. An unscrupulous debtor who intentionally misleads a creditor with false financial statements should have their deception excused by imposing an affirmative duty upon the creditor to conduct a thorough investigation for every potential piece of false information. That's not what the law requires. That's what Judge Nelms seems to think was the law, and that's improper. Counsel, after this thing, you didn't have to make a thorough examination. She cites from the record, it says the bank had minimal information, the business couldn't sustain it, the debtor's status. She seems to be arguing not that there was a requirement to do a more thorough one, but that within the papers that the bank had, there was information. The business couldn't support it, the debtor couldn't support it,  given this statement. But that seems to be the argument. And you seem to be saying that they're arguing the bank should have, you know, hired an investigator to have done more. Well, the issue here with respect to reasonable alliance is focusing, obviously, on the debtor's financial statement, whether it was reasonable to rely upon that. The statement in the memo doesn't have an analysis behind it. It just says there may be some problems. We don't know what that is. There's no testimony with respect to that. But what we do know is that, as Judge Nelms said, is this financial statement was materially false. He said it was presented with the intent to deceive my client. My client could never have known. I mean, they would have to have hired some outside agency to search all state records across the United States to determine if there was a potential, a consent judgment going to be entered against the guarantor that would have fixed his liability at $2.3 million. How would they ever know that? They're required to make a minimal analysis. The low, the bar is low, as counsel in my brief suggests. Thank you very much, Your Honor. I appreciate your time. Yes, thank you, Mr. Ackery. Your case is under submission. The last case for today, Wilson v. Ackery.